## OREGON-WASHINGTON BRIDGE CO.
## v. UNITED STATES.

### No. 45760.

Court of Claims.

Oct. 1, 1945.

Plaintiff seeks to recover $22,998.84, consisting of three items of (1) $14,000 erroneously deducted by the War Department from the cost to plaintiff of altering its bridge across the Columbia River so as to provide for navigation, pursuant to the act of August 16, 1937, 50 Stat. 648; (2) $4,052.35, balance due for engineering services on alteration of piers; and (3) $4,946.49, balance due for engineering services with reference to construction and installation of a lift span.

Special Findings of Fact.

1. Plaintiff is a corporation organized under the laws of the State of Washington and has been the owner and operator of a toll bridge across the Columbia River at Hood River, Oregon.

*Claim for $14,500 Deducted by Defendant from Payment for Net Construction Costs Under the Act of August 16, 1937*

2. The bridge was built by plaintiff in 1923 and 1924. Construction of Bonneville Dam, situated downstream from the bridge, was commenced by defendant in 1934 and a controversy ensued as to whether defendant would be liable to plaintiff for the cost of reconstructing the bridge so as to make it safe against the pressure of ice at the heightened water level in the pool to be created by the dam. At the same time discussion arose concerning the nature and the cost of altering portions of the bridge so as to afford passage to seagoing vessels. The defendant contended that it would be liable only for damages occasioned by flooding shorelands; that the United States could, without compensating plaintiff therefor, require plaintiff so to alter the bridge as to prevent it from obstructing navigation. Plaintiff denied that the necessity for reconstruction was due to the needs of navigation. It contended that the dam was being built to a greater height than actually needed for navigation; that the extra height created the condition requiring reinforcement and alteration of the bridge; that such extra height was for the primary purpose of developing hydroelectric power; and, this being the object, the admitted servitude for purposes of navigation was not involved and the United States was obliged to compensate plaintiff.

Since its completion in December, 1924, plaintiff has kept the toll bridge in continuous operation for public travel, including the period when the lift span was being installed and when piers 8 and 9 were being reinforced, as hereinafter mentioned, to support the lift span.

3. The matters mentioned in the preceding finding were discussed at various times by representatives of the parties, and at a conference on May 22, 1936, representatives of defendant proposed that the defendant pay to plaintiff the sum of $250,000 in full for flowage easements, it then being contemplated that such easements would be condemned by action in the United States District Court and the damages stipulated. Defendant's offer was based upon its own estimate, which was not communicated to plaintiff, of cost of reinforcing the bridge to withstand ice pressure at the proposed new levels, which estimate included, among various others, the following items:

Reinforcing Pier 8 with block on
base and ice breaker ........... $12,500
Ice breaker on Pier 9 ............ 1,500

Plaintiff's estimate of the cost of reinforcing piers 8 and 9 against ice pressure was $3,500 to $4,000, but its estimate for the entire bridge was substantially higher than that of the defendant. The evidence does not satisfactorily indicate which estimate as to piers 8 and 9 was more nearly correct.

Various estimated items of reinforcement and additional construction were discussed at the time of defendant's offer, but no copy of defendant's estimate was then given to plaintiff and it does not appear from satisfactory evidence that the items relating to piers 8 and 9 were called to the attention of plaintiff's representative prior to culmination of the negotiations for flowage easements.

The amount offered by defendant was shortly after increased by $2,831, being $100 an acre for 28.31 acres of riparian land belonging to plaintiff, making a total of $252,831 offered by defendant in full for flowage easements, which offer was accepted by plaintiff May 25, 1936, by telephone communication to defendant's Division Engineer at Portland, Oregon. This offer by defendant and its acceptance by plaintiff was a compromise settlement of all matters in dispute between the parties in connection with the flowage easements acquired by defendant.

Defendant's offers, first of $250,000 and later of $252,831, were based on its own estimates of the cost of reinforcing the bridge to withstand ice pressure at the proposed new levels.

The defendant's estimate, totaling $244,000 (which is in evidence as a part of exhibit 20-D), and the blueprint entitled "Revision of Hood River White Salmon Bridge over Columbia River" (exhibit 21) were both prepared by defendant subsequent to the conference of May 22, 1936, to-wit, on or after June 1, 1936, but no copy of either the estimate or the blueprint was submitted to plaintiff until about December 3, 1937, more than eighteen months later. In said estimate an item of $60,000 was included by defendant for six steel trusses or spans. In the conference of May 22, 1936, above referred to, defendant's representatives had verbally allowed $108,000 for these trusses or spans. The actual cost of installing them was approximately $120,000, which was double the amount allowed therefor in defendant's estimate. The $252,831 subsequently paid by defendant to plaintiff for the flowage easements fell far short of meeting the costs of the work outlined in defendant's blueprint (exh. 21).

At the conference on May 22, 1936, hereinbefore referred to, plaintiff's estimate of the cost of the necessary alterations of the bridge, including those necessary to withstand ice pressure at the proposed new water level, was in excess of $500,000. At that conference, as a result of a suggestion made by the representative of defendant with respect to shoring up the piers (which suggestion was incorporated in the blueprint, exhibit 21), plaintiff reduced its estimate of cost to $365,000.

In April 1938, while plaintiff was endeavoring to persuade the War Department to pay the $14,000 item which had been deducted from Voucher No. 2587 as described in findings 10, 11 and 12, plaintiff's president and engineer, E. M. Chandler, at the suggestion of the Chief of Engineers, prepared an estimate of the cost of reinforcing pier 8 against ice pressure only. This estimate, amounting to $3,500, was submitted to Col. Robins as suggested by the Chief of Engineers but nothing was done about it.

4. June 20, 1936, the Secretary of War approved the following recommendation of the Chief of Engineers:

"1. The Bonneville Dam now under construction in the Columbia River will, when placed in operation, cause a substantial rise in water levels at the site of the Interstate Bridge between Hood River, Oregon, and White Salmon, Washington. The bridge is owned by the Oregon-Washington Bridge Company, which also owns a small parcel of land at each end of the structure upon which portions of the approach roadways, toll houses and other appurtenances utilized in the maintenance and operation of the bridge are located.

"2. The lands of the bridge company, including the roadway approaches thereon, will be submerged by the pool of the dam and a flowage easement must be acquired on said lands. A portion of the trestle approaches, situated on the company's property above the ordinary high water lines, must be raised to place it a safe distance above the new water levels.

"3. The main bridge structure was not designed to withstand the pressure of ice at the higher elevations to be created by the dam. Reinforcement and strengthening of the structure will be necessary to make it safe after the pool is raised, and this work should be done before the dam is placed in operation. Otherwise, it will be difficult and more expensive, and there will be danger of serious damage to the bridge and interruption of traffic.

"4. The bridge company represents that it is not in a position to raise the necessary funds to do this work. It contends that the price which the Government pays for the

flowage easement over its lands should include the cost of all alteration and reinforcement of the bridge structure necessitated by the increased water levels, and urges that payment be made promptly so that the money can be used by the company to make the necessary changes in the bridge before the dam is placed in operation and the water level is raised. The company's contention is based on the theory that the dam is being built to a greater height than is actually needed for navigation and that this extra height, which is the real cause of the damage to the bridge, is primarily for power development. Under this theory it is urged that the Government's servitude in favor of navigation on property within the high water lines does not apply. A further argument in support of the company's contention is that since some of its property above high water is unquestionably being taken, the proper measure of damages for such taking includes all damage to the remainder of the company's property (including the bridge structure) used in connection with that actually taken. The company estimates the damage at $500,000.00 or more.

"5. The filing of a condemnation suit without an agreement as to the sum to be awarded will undoubtedly precipitate a prolonged legal controversy, which, if decided in favor of the bridge company's contention, will result in a judgment against the Government in an amount up to $500,-000.00. If no steps are taken to acquire the flowage easement on the bridge company's property prior to completion of the dam and the project is then placed in operation the company may be expected to file an injunction proceeding. Such a proceeding might delay the full utilization of the project for an indeterminate period. The Division Engineer reports that the dam could be operated so as not to interfere with existing navigation or the passage of fish, without flooding the roadway approaches or the upland belonging to the bridge company. Limiting the pool to such elevation would, however, result in almost complete loss of power head at the dam during high water, making it impossible to dispose of surplus power to any advantage.

"6. Under the circumstances, the Division Engineer believes that the public interest will best be served by agreeing in advance of the filing of condemnation proceedings, on the amount to be awarded for the required easements. After extended negotiations with the President of the Bridge Company, he recommends that the Government agree to pay the sum of $23,-874.00 for a flowage easement on the 2.6 acres of land at the Oregon end of the bridge, and the sum of $228,957.00 for the easement on the 26.44 acres at the Washington end.

"7. It is the view of this office that there is merit in the Bridge Company's argument, and that litigation of the question, whether initiated by the Government in the form of a condemnation proceeding or by the Company in the form of an injunction proceeding, is very apt to delay the full utilization of the project, even though the legal questions involved are ultimately decided in favor of the United States. Accordingly, I concur in the view of the Division Engineer that settlement of the controversy by agreement is desirable. Condemnation will be necessary to obtain clear title even though agreement is reached on the price.

"8. I recommend that the prices proposed by the Division Engineer, totalling $252,831.00, be approved, and that authority be granted to inform the bridge company that when it has agreed in writing to the entry of awards in the approved amounts in full satisfaction of all claims which said company may have on account of the construction, maintenance and operation of the Bonneville Dam, the Department will request the Attorney General to initiate condemnation proceedings to acquire flowage easements on its property."

5. While negotiations for the acquisition of flowage easements were pending, representatives for both parties knew that in order to accommodate seagoing vessels the bridge would have to be altered by installing a lift span, but that authorization and payment therefor must await Congressional action. The parties knew that piers 8 and 9 would have to carry the load of the lift span and therefore would have to be materially reinforced to an extent far exceeding and much different from the reinforcing that would have been necessary to provide against ice pressure alone.

Notwithstanding the impossibility of securing immediate Congressional authorization, representatives of the parties were agreed that reinforcement of piers 8 and 9 in a manner adequate to provide support for the anticipated lift span must be commenced without awaiting such authorization so as to finish the work before the water level was raised on completion of the

dam. Therefore, in September 1936, and before final acquisition of the flowage easements had been consummated, reinforcement of piers 8 and 9 was commenced by plaintiff for the purpose of supporting the lift spans, and not for the purpose of providing against ice pressure alone.

Thereafter, and before completing the acquisition of flowage easements, defendant requested assurance from plaintiff that the money paid in consideration for the easements would be utilized to reinforce the bridge and would not be used to retire pre-existing indebtedness. Accordingly, on December 2, 1936, plaintiff assured defendant in writing that the $252,831, so far as the amount would go, would be expended on alterations and reconstruction of the bridge. This letter listed seven general items, but did not include the items for reinforcing piers 8 and 9 against ice pressure as listed in defendant's estimate at the time it made its offer of settlement. Defendant accepted the deeds for the flowage easements and paid the consideration without further requirements in this respect, knowing that piers 8 and 9 would be reconstructed and not merely reinforced against ice pressure alone.

6. Instead of condemning the flowage easements, defendant decided to take deeds of flowage easements over plaintiff's land. One deed described the land on the Washington side of the river and recited a consideration of $228,957. The other described the land on the Oregon side of the river and recited a consideration of $23,874. Otherwise the deeds were identical, and each contained the following provisions:

"That whereas, the Government is constructing a dam across the Columbia River between the States of Oregon and Washington at Bonneville, Oregon, and upon the completion of said dam will operate and maintain a spillway, power house and ship lock; and

"Whereas, under operating conditions, all lands abutting on either bank of said river from Bonneville to the Celilo Canal which are below the elevation of the backwater curve which begins at the dam at 72.0 feet above mean sea level (as determined by reference to the U. S. C. & G. S. bench mark, B. 24, situate about one mile east along the Oregon-Washington Railroad & Navigation Company's track from Warrendale, Multnomah County, Oregon, in the north end of a concrete culvert, at

elevation 72.533 feet) will be permanently flooded; and

"Whereas, the Government in operating said structures, will increase periodically the depth and duration of the overflow on a portion of said lands, later described, lying above elevation 72.0 feet; and

"Whereas, the Government desires to purchase a perpetual flowage easement from the said Grantor and said Grantor desires to sell said perpetual flowage easement to the Government;

"Now, Therefore, the said Grantor, for and in consideration of the sum of Two Hundred and Twenty-eight Thousand Nine Hundred and Fifty-seven and no/100 Dollars ($228,957.00) cash in hand paid by the Government, the receipt whereof is hereby acknowledged, does hereby grant, bargain, sell and convey to the Government, or its assigns, forever, the full and perpetual right, power, privilege and easement to overflow as hereinbefore stated, all of the following described lands: [Description of land]

"To Have and to Hold unto the Government, or its assigns, forever, together with the right to go upon the lands above described from time to time as the occasion may require and remove therefrom the timber and other natural growth, and any accumulations of brush, trash, or driftwood;

"And the said Grantor and its successors and assigns covenant that it is in the quiet and peaceful possession of said lands, and that it will defend the title to the right, power, privilege and easement hereby granted and conveyed, as aforesaid, to the Government or its assigns, against the lawful claims of all persons whomsoever.

"And the said Grantor, in consideration of the above specified sum, also hereby releases the Government from all claims for damages that have accrued or may hereafter accrue to it by reason of the construction, maintenance and operation of the Bonneville Dam, except any claims (whether valid or invalid—and the Government does not recognize the validity of any such claims) that may hereafter be presented for the cost of altering its bridge to provide such clearance for sea-going vessels as the Government may hereafter require."

The deeds were executed and delivered, subject to approval of title, November 21,

1936, and plaintiff received payment of the consideration April 30, 1937.

The final paragraph of the deeds, as above quoted, containing the release clause and the exception thereto, was placed in said deeds at the insistence of the Chief of Engineers who wrote to Col. Robins on October 13, 1936, as follows:

"The plan of settlement proposed by the attorneys for the bridge company is acceptable to this department. The form of the instrument submitted herewith is satisfactory except that the next to the last paragraph of the easement deeds should be changed to read as follows: * * *.

"The deeds of flowage easements were executed by plaintiff and delivered to defendant and were accepted and paid for by defendant as a final settlement and compromise of all disputes then existing between the parties with respect to construction, maintenance and operation of the Bonneville Dam (except possible future claims for navigation alterations).

"At the time of execution and delivery of the deeds and at the time the consideration therefor was paid by the defendant to plaintiff Congress had not authorized any navigation alterations to plaintiff's bridge and no authority existed for the allocation by defendant of the $14,000 item previously paid for navigation alterations to the bridge."

7. August 16, 1937, 50 Stat. 648, the following act of Congress was approved:

"That the Secretary of War be, and he is hereby, authorized and directed to cause such alterations in existing bridges across the Columbia River at Cascade Locks and Hood River, Oregon, as will render navigation for ocean-going vessels in the pool formed by the Bonneville Dam reasonably free, easy, and unobstructed, and to reimburse the owners of said bridges for the actual cost of such alterations from appropriations heretofore or hereafter made for maintenance and improvement of rivers and harbors."

8. Pursuant to this act, the Secretary of War on September 9, 1937, wrote to plaintiff directing it to install a lift span in the bridge and stating that plaintiff would be reimbursed for the cost of such alterations.

9. Meantime, under the supervision of and with the consent of representatives of the defendant, plaintiff already had been engaged in the work of reinforcing piers 8 and 9 to make them strong enough to support the lift span which it was anticipated, when the settlement of May 25, 1937 was agreed to, would be authorized by Congress. Such reinforcement was substantially different from that which would have been required to reinforce against increased ice pressure alone. The primary purpose of the reinforcement, as actually done, was to provide proper and adequate support for the lift span, but when completed the piers were also strong enough to withstand the stress of ice pressure at the heightened water level.

10. September 23, 1937, plaintiff submitted to the District Engineer invoices for the portion of the work done on said piers up to August 24, 1937 (exclusive of engineering expense) in the amount of $31,890.08.

11. November 5, 1937, the District Engineer informed plaintiff that the War Department had approved payment of $31,890.08 less the sum of $14,000, which the Government then claimed had been included in the consideration ($252,831) paid for the flowage easements and the releases contained therein.

This was the first intimation ever given plaintiff that any portion of the $252,831 consideration was considered by the defendant as payment for part of the work to be done in reinforcing piers 8 and 9 in order to support the lift span.

12. December 1, 1937, the plaintiff in order to be reimbursed for the undisputed items of cost incurred by it submitted to the District Engineer under protest a voucher covering the actual cost of all the work on piers 8 and 9 prior to that date in the total amount of $56,929.19 less the item of $14,000. Subsequently defendant paid plaintiff $42,929.19, being the amount claimed in this voucher, less the amount of $14,000.

13. All the work performed by plaintiff and covered by the vouchers above mentioned was necessarily performed pursuant to the act of Congress (finding 7) and under the direction of the Secretary of War. The cost thereof is a part of the actual cost of alterations to the bridge necessary to render navigation reasonably free, easy, and unobstructed for ocean-going vessels in the pool formed by the Bonneville Dam.

### Claim for $4,052.35, Cost of Engineering Expense on Piers 8 and 9

14. In order to make alterations in piers 8 and 9 and to construct the lift span, plaintiff was required to obtain the services of an engineer qualified in the designing and construction of bridges. The engineering work involved difficult and unusual problems. Plaintiff employed E. M. Chandler to prepare plans and specifications and to supervise the construction, promising to pay him therefor an amount equal to ten percent of the net construction cost. This rate of compensation was usual and was reasonable for the work performed. Chandler was president of plaintiff corporation at all times here involved, and was also a qualified and licensed bridge engineer fully competent to perform the engineering services required. The engineering services performed by Chandler were in addition to his duties as president of the corporation.

15. Chandler performed such services and plaintiff paid him $10,514.70, that sum being ten percent of the net construction cost in altering piers 8 and 9. Chandler necessarily spent 180 days' time in performing his engineering services with respect to piers 8 and 9, and necessarily expended $5,225 in performance of said services for which no separate payment was made. The engineering services were satisfactorily performed and the amount paid to Chandler was not more reasonable compensation than for the engineering services rendered by him on piers 8 and 9.

16. Defendant's allowance of compensation for engineering services in the amount of $6,462.35 was based on the following scale of compensation: "5 percent of the construction cost for general engineering service; plus actual cost of material inspection and so much of the salary of the resident engineer as may be determined as applicable to the reconstruction of piers 8 and 9."

This allowance by defendant was less than a reasonable compensation for the engineering service performed by Chandler. The reduction by defendant was not made because the engineering services were unsatisfactory. If plaintiff had employed an independent engineer and paid him the sum paid Chandler, the defendant would have reimbursed the amount in full.

Plaintiff accepted the $6,462.35 under protest and reserved its right to claim the balance of $4,052.35.

### Claim for $4,946.49, Cost of Engineering on the Lift Span

17. Plaintiff paid $17,205.50 to E. M. Chandler for engineering services, that sum being ten percent of the net construction cost of installing the lift span. Chandler necessarily spent 166 days' time in performing his engineering services with respect to installing the lift span, and necessarily expended $14,098.69 for which no separate payment was made. The engineering services were satisfactorily performed and the amount paid to Chandler was reasonable compensation for the engineering services rendered by him in connection with installing the lift span.

18. Defendant declined to reimburse that portion of the $17,205.50 paid to Chandler in excess of $12,259.01.

The defendant's allowance for these engineering services was based upon five percent of the construction cost of the lift span plus the actual cost of material inspection, and so much of the salary of the resident engineer as was applicable to that work. This allowance was less than a reasonable compensation for the engineering services performed by Chandler. A compensation or fee of $17,205.50 was reasonable for the engineering services rendered by Chandler with respect to installing the lift span. Plaintiff accepted the $12,259.01 under protest and reserved its right to claim the balance of $4,946.49.

Charles T. Donworth, of Seattle, Wash., for plaintiff.

Brice Toole, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice. and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

Plaintiff, since 1924, has owned and operated a toll bridge across the Columbia River between Hood River, Oregon, and White Salmon, Washington. In 1934 defendant commenced construction of the Bonneville Dam across the Columbia River about twenty-five miles downstream from the bridge. During the three years from 1934 to 1936 a controversy ensued as to whether the defendant was obligated to compensate plaintiff for the cost of altering and reconstructing certain parts of the bridge, because of the construction of the dam, so as to make the bridge safe against

increased pressure of ice at the new water level in the pool which was to be created by the Bonneville Dam. The Government advised plaintiff that when the dam was completed the elevation of the water at plaintiff's bridge would be twenty-seven feet higher than it had been under natural conditions.

Plaintiff took the position that the Bonneville project was not essentially a navigation project but was primarily a hydroelectric project and that consequently the Government was obligated to pay just compensation for damages to the bridge caused by the raising of the water. The Government took the position that it was under no obligation to pay plaintiff anything for the taking of property rights because the Bonneville project was primarily a navigation improvement and that plaintiff was entitled to no compensation for damages by reason of the raising of the water level.

As set forth in findings 3 to 6, inclusive, negotiations were carried on between the parties and conferences were held with reference to plaintiff's claim for compensation of $500,000. As a result of the negotiations the defendant, on May 22, 1936, offered plaintiff a lump sum of $250,000 for flowage easement in compromise and full settlement of plaintiff's claim by reason of the construction and maintenance of Bonneville Dam. On May 25, 1936, plaintiff advised defendant that if it would increase its offer to $252,831 plaintiff would accept it. This was agreed to, and that amount was paid April 30, 1937, after the execution and delivery by plaintiff of the flowage easement deeds of November 21, 1936.

■ This was definitely a compromise settlement of the matters in controversy between the parties. There were many items of value, costs, and expenses, in large sums, which both the plaintiff and the Government engineer obviously considered, but there was no itemization of the amount offered and paid by defendant and there was no understanding or agreement between the parties as to what items or amounts should go to make up the total to be paid. Plaintiff was not advised at any time prior to consummation of the settlement agreements and the payment of the compromise sum of $252,831 that any specific amount had been included therein by defendant for the cost of reinforcing piers 8 and 9 against ice pressure only. Moreover, as set forth in finding 5, both parties knew during the

negotiations for settlement of plaintiff's claim that it would be necessary to install a lift span in the bridge at piers 8 and 9 to accommodate seagoing vessels in the pool created by the dam and that these piers would have to be altered and reconstructed to carry the load of this lift span, and that, in September 1936, before the settlement agreements of November 21 were prepared and executed, plaintiff agreed to and did proceed with the work of altering and reinforcing piers 8 and 9 for the purpose of supporting the lift span without awaiting action by Congress on the matter of reimbursement by the Government for this cost. In these circumstances plaintiff had no reason to believe and certainly there was no understanding or agreement that any portion of the sum paid in compromise and settlement of plaintiff's claim for compensation, other than for navigation alterations, would be deducted by defendant from the cost to plaintiff of such navigation alterations in the event Congress should later agree to reimburse plaintiff therefor. The release exacted by the Government and given by plaintiff in the deeds (finding 6), with the reservation by plaintiff of the right to claim reimbursement for the cost of navigation alterations to piers 8 and 9, precludes the Government, in the absence of fraud or mistake, from now claiming the right to deduct from such navigation alteration costs any portion of the amount previously paid in compromises of other claims of plaintiff for compensation.

The act of Congress enacted August 16, 1937 (finding 7), fifteen months after the compromise settlement of $252,831, the provisions of which act were well known to the War Department during its consideration, made no exception as to full reimbursement to plaintiff "for the actual cost of such alterations."

For the reasons stated hereinabove, the War Department was not authorized to reopen the compromise settlement agreed upon May 25, 1936, and deduct $14,000 of the amount previously paid plaintiff thereunder from the actual costs due it under the act of August 16, 1937, and plaintiff is entitled to judgment for this amount.

■ The last two items of plaintiff's claim for $4,052.35 and $4,046.49 representing amounts paid by plaintiff to its president, E. M. Chandler, for engineering services actually performed by him in connection with piers 8 and 9 and the lift span

(findings 14 to 18) are submitted by defendant on the facts without argument. These expenses were necessary and were actually paid. They are shown by the uncontradicted evidence to have been entirely reasonable. The engineering services involved were necessary in connection with the work required on the bridge structures, and had plaintiff employed an engineer outside its own organization the expenses for such services would have been at least as much as it paid its president therefor. Plaintiff is therefore entitled to recover on these two items a total of $8,998.70.

Judgment is entered in favor of plaintiff for $22,998.84. It is so ordered.

WHALEY, Chief Justice, and WHITAKER, Judge, concur.

MADDEN and JONES, Judges, took no part in the decision of this case.